IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN MICHAEL SHERRILL, | § | |
| TDCJ-CID NO. 1442172, | § | |
| Petitioner, | § | |
| v. | § | CIVIL ACTION NO. H-11-0338 |
| | § | |
| RICK THALER, | § | |
| Respondent. | § | |

OPINION ON DISMISSAL

Petitioner Steven Michael Sherrill, an inmate incarcerated in the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ-CID"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his capital murder conviction, for which he received a life sentence. (Docket Entry No.1). Respondent has filed a motion for summary judgment (Docket Entry No.15). Petitioner has filed several responses to the motion. (Docket Entries No.18, No.19, No.21). After considering all of the pleadings and the entire record, the Court will grant respondent's motion for summary judgment, and dismiss this habeas petition.

I. BACKGROUND AND PROCEDURAL HISTORY

Petitioner was indicted on a charge of capital murder in cause number 1068120. The indictment alleged that he murdered complainant Christine Van Osdall by shooting her with a firearm in the course of committing aggravated sexual assault or kidnapping. (Docket Entry No.11-9, page 17). He entered a plea of not guilty to the offense. (Docket Entry No.11-17, page 46). A jury in the 263rd Criminal District Court of Harris County, Texas, heard evidence of the following, as summarized in pertinent part by the First Court of Appeals for the State of Texas:

In the fall of 1999, Christine Van Osdall met Sherrill through a dating service. They began dating in November 1999. At the end of January 2000, Van Osdall expressed concerns to two of her friends that their relationship was progressing too quickly. Van Osdall decided to break up with Sherrill but was worried because he had told her he would kill himself if she broke up with him.

On February 3, Van Osdall consulted a social worker, Meg Scott, about ways to safely end the relationship. Scott testified that Van Osdall was not ambivalent about wanting to end the relationship. Scott recommended that Van Osdall write Sherrill a letter expressing her concerns. Van Osdall took notes about what to tell Sherrill. When she returned home that day, she showed the notes to her roommate, Mary Jo Alberto. Van Osdall then telephoned Sherrill in Alberto's presence and read the letter to him. Sherrill convinced Van Osdall to go to his house to talk in person after she had finished a dinner in celebration of her mother's birthday. Because Alberto had a bad feeling about Van Osdall going to Sherrill's apartment, she requested Sherrill's phone number and address. She also made a plan with Van Osdall that when Van Osdall returned home that night, she would turn off the kitchen light so that Alberto would know she had been home. Van Osdall did not ask Alberto to take care of her dog, which she had always done in the past if she planned to spend the night away from home.

Van Osdall had dinner with her family and dropped her aunt off at 9:15 P.M. She left a voicemail for Sherrill stating that she was on her way over. Sherrill called his supervisor at work and told him that he was working things out with his girlfriend and would not be able to work his scheduled 11:00 P.M. to 7:00 A.M. shift. Around 2:30 A.M., Alberto awoke and realized that Van Osdall had not turned off the kitchen light as they had planned. Alberto telephoned both Sherrill and Van Osdall, but did not receive an answer. She left a message saying that Van Osdall's dog was sick, in hopes that if Van Osdall checked it, she would call her back. Later that morning, Alberto drove to Sherrill's apartment complex and saw Sherrill's car in the parking lot but not Van Osdall's car. That day, she filed a missing person's report with the Harris County Constable.

That same afternoon, Moises Murillo was fishing with some family members near Addicks Reservoir when he found Van Osdall's body under a blue tarp in the woods. They went to the police station to report it and then returned to the reservoir to help locate her body. They were unable to find her body that night but returned the next day, at which time he lead police to her body. Van Osdall's body had been covered with dirt and debris, apparently in an attempt to hide it. She wore a denim dress, and her panties were missing. She had suffered a gunshot wound to the head. The officers saw what appeared to be dried semen on her thigh, although

2

this was not preserved for later testing.  Ligature marks appeared on her right hand and wrist, and fishing line was tied to her left wrist.  Using a metal detector, Sergeant Davila located a fired 9mm bullet near her body.

Van Osdall's roommate, Alberto, identified Van Osdall and informed the detectives about Van Osdall's plans on the night she disappeared.  Sergeants Binford and Allen went to Sherrill's apartment on Sunday evening to interview him.  The sergeants testified that when they arrived, Sherrill acted agitated and irritated, failed to keep eye contact, and crossed his arms.  He did not ask any questions about what had happened when they told him that Van Osdall was dead.  Sherrill consented to a search of his apartment.  Allen found small amounts of leaves and twigs in Sherrill's apartment and collected them.  Sherrill accompanied the officers to the police station where he gave written consent for hair and saliva samples and fingernail clippings.  The detectives noted that Sherrill's fingernails were dirty, which they felt was significant since there had been an attempt to cover Van Osdall's body with dirt and debris.  Before the detectives could collect fingernail scrapings from Sherrill, he stated that he was tired and ready to return home.  When they returned to Sherrill's apartment, he allowed the detectives to listen to his voicemail, which contained a message from Van Osdall stating she was on her way to his apartment, as well as a message from Alberto stating the Van Osdall's dog was sick.  Sherrill agreed to meet the detectives the following day before they left.

The next morning, when the detectives arrived at Sherrill's apartment, he was not there.  Sherrill had briefly visited his brother early that morning and had withdrawn $1400 from his bank account.  The police did not learn of Sherrill's whereabouts again until 2005, when they discovered that he was back in Houston.  During his more than five-year absence, Sherrill wrote letters to his daughter, in which he told her not to let anyone know she was talking to him, to use a different email address, and to be careful when talking on the telephone.  Sherrill also asked his brother to find out whether any warrants had been issued for his arrest.  Detectives later learned that Sherrill had moved to Las Vegas and then met a woman on the internet who lived in Montana.  He moved in with her in Helena, Montana, giving her a false name and background.

The detectives continued investigating Van Osdall's murder during Sherrill's absence.  On March 20, 2000, police located Van Osdall's car in an apartment complex parking lot near the Greenspoint area.  The car had been driven with a key since the steering column was still intact.  One witness stated that he had seen a young, black male driving the car but the police were unable to locate who that person might have been.  Sherrill's thumbprint matched a fingerprint investigators found on the passenger seat belt.

In April 2000, after Sherrill's apartment complex had left several notices to vacate on Sherrill's door, Sergeant Allen returned to Sherrill's apartment and searched it.  Sherrill had abandoned the apartment, leaving clothes and furniture.  Allen found a pair of white panties in Sherrill's drawers.  The DNA on these panties later matched Van Osdall's DNA. Allen also found some blood in Sherrill's sink which was later determined to be Sherrill's blood.

During their investigation, the detectives interviewed Richard Holley, who previously worked with Sherrill.  Holley testified that he had sold Sherrill a Lorcin 9mm handgun in 1998.  Ballistics tests determined that the bullet that killed Van Osdall had been fired from one of four types of guns, including a Lorcin semi-automatic.

Without any further leads, the investigation halted until 2005 when Sergeant Mehl, who was part of the cold case squad, re-opened the case. Mehl located the physical evidence from the case and realized that much of it had not been tested.  Mehl sent a pubic hair that had been found on Van Osdall's sock for DNA testing.  DNA analysis determined that Sherrill's mitochondrial DNA matched that of the hair, but the hair could not be positively identified as Sherrill's, because anyone in his maternal line would have matched it.  Mehl testified that in his opinion, the hair was deposited on her sock at the crime scene because he did not think it would have remained on her sock for the walk through the vegetation to the crime scene.  Mehl also had Van Osdall's dress tested for the presence of semen.  He believed that the dress may have rubbed the semen off her leg that investigators had seen at the scene.  Two DNA profiles were found on the dress: the epithelial sample matched Van Osdall's DNA and the sperm fraction matched Sherrill's DNA.

Mehl also contacted Dr. Larry Brown of the Spring Branch Science Center Herbarium to examine the leaf Sergeant Allen had collected from Sherrill's bedroom floor.  Brown testified that the leaf was from a cedar elm tree, which is a tree found in areas prone to flooding.  Mehl took Brown to the crime scene in Addicks Reservoir, where he found a cedar elm tree about twenty feet from where Van Osdall's body had been. Mehl also took Brown to Sherrill's apartment complex to see if any similar trees were located there.  Brown testified that no cedar elms were planted in or around Sherrill's apartment.  He reasoned that this was because cedar elms are not generally used for domestic landscaping.  Mehl arrested Sherrill in 2005.  Sherrill did not present any evidence at trial.

*Sherrill v. State*, No.01-07-00503-CR; 2008 WL 4670606, *1-3 (Tex. App.--Houston [1st Dist.] 2008, pet. ref'd) (not designated for publication) (full opinion at Docket Entry No.11-2, pages 23-42).

On June 4, 2007, the jury found petitioner guilty of the capital offense and the state district court sentenced him to life imprisonment  (Docket Entry No.11-17, pages 46-47). Petitioner filed a notice of appeal; he was found to be indigent and counsel was appointed to represent him on appeal.  (*Id.*, pages 49-51).

On direct appeal, petitioner complained of the following:  (1) the state district court violated his constitutional rights by submitting a disjunctive jury charge and (1) the evidence was legally and factually insufficient to support the verdict.  *Sherrill*, 2008 WL 4670606 at *1.  The state intermediate appellate court addressed each claim on the merits and affirmed the lower court's judgment of conviction.  *Id.* at *9.  Petitioner filed a petition for discretionary review seeking review of the appellate court's opinion on the disjunctive jury charge ground.  (Docket Entry No.11-2).  The Texas Court of Criminal Appeals refused his petition for discretionary review.  *Sherrill  v. State*, P.D.R. No. 1670-08; (Docket Entry No.1, page 3).

Thereafter, petitioner sought state habeas relief.[1]  The state district court, sitting as a habeas court, recommended that petitioner's state habeas application be denied and entered

---

[1] Petitioner sought state habeas relief from his conviction on the following grounds:

    1.     The prosecutor failed to turn over material and exculpatory evidence to the defense and destroyed one piece of material evidence;

    2.     The state district court limited voir dire of venire persons;

    3.     The state district judge informed a venire person that he would not be chosen for jury duty, which tainted the jury panel and denied him his right to peremptory challenges;

written findings.  (Docket Entry No.11-52, pages 67-69).  The Texas Court of Criminal Appeals denied the application without a written order on the findings of the trial court without a hearing. (Docket Entry No.11-51, page 2).

Liberally construing petitioner's rambling pleadings, the Court finds that petitioner seeks federal habeas relief on the following grounds:

1.     He is actually innocent of capital murder;

2.     He has been denied a free copy of his trial transcripts;

3.     He was denied his right to a jury trial by the use of peremptory challenges;

4.     The statute of limitations applicable to federal habeas petitions filed under 28 U.S.C. § 2254 is unfair;

---

4.     The state district judge did not question a venire person who knew complainant;

5.     The state district judge excused several venire persons by challenges for cause and peremptory challenges because of the venire persons' race;

6.     He was denied the right to confront the witness who conducted the DNA testing of certain evidence;

7.     He was denied a lesser-included offense instruction in the jury charge;

8.     The prosecutor made an inappropriate statement in his final argument regarding the disjunctive jury charge;

9.     The State revealed details of petitioner's prior acts to a prison psychologist;

10.    He was denied a free copy of the trial transcript even though he was found to be indigent and mentally challenged;

11.    The State destroyed material evidence of his first taped interview after the murder, failed to disclose cell phone records, and planted evidence at his apartment to tie him to the case;

12.    He was denied the effective assistance of counsel at trial; and,

13.    He has been handicapped by the State's refusal to provide him with a free copy of his trial transcript within the one-year limitations period to file a federal habeas petition under 28 U.S.C. § 2254.

(Docket Entry No. 11-51, pages 7-40).

     5.      He was denied a fair trial by the State's destruction of material evidence, *i.e.*, a tape of his first police interview;

     6.      He was denied a fair trial by the prosecution's suppression of evidence related to complainant's cell phone records;

     7.      Petitioner was denied the right to a jury trial by a charge that allowed a lack of unanimity on the aggravating factor and he suffered egregious harm by the same;

     8.      The evidence is legally and factually insufficient to support the verdict;

     9.      He was denied the right to confront the analyst who conducted the DNA testing; and,

     10.    He was denied the effective assistance of counsel at trial.

(Docket Entries No.1, No.2).

Respondent moves for summary judgment on grounds that petitioner has failed to meet his burden of proof under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his claims fail on the merits, and some of his claims are unexhausted and procedurally barred.  (Docket Entry No.15).

## II. STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact."  *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*,

18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *United States v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

      The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, – U.S. –, 131 S.Ct. 770, 787 (2011) (noting that "state courts are the principal forum for asserting constitutional challenges to state convictions").  The Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified as amended at 28 U.S.C. § 2254(d), "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt"; it also codifies the traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review.  *Renico v. Lett*, – U.S. –, 130 S.Ct. 1855, 1862 (2010) (quotations omitted).

      The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)."  *Richter*, 131 S.Ct. at 784.  As previously mentioned, the Court of Criminal Appeals adjudicated petitioner's claims on direct appeal and on habeas review.  This Court, therefore, can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, – U.S. –, 130 S.Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)).  The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Thus, the AEDPA serves as a "guard against extreme malfunctions in the state criminal justice systems," not as a vehicle for error correction.  *Richter*, 131 S.Ct. at 786

(citation omitted); *see also Wilson v. Cain*, 641 F.3d 96, 100 (5th Cir. 2011).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, 131 S.Ct. at 786.

"Review under § 2254(d)(1) focuses on what a state court knew and did."  *Cullen v. Pinholster*, – U.S. –, 131 S.Ct. 1388, 1399 (2011).  Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.*, 131 S.Ct. at 1399, 1400.  Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Id.*, 131 S.Ct. at 1400.

While Rule 56 of the Federal Rules regarding summary judgment applies generally "with equal force in the context of habeas corpus cases," *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000), it applies only to the extent that it does not conflict with the habeas rules.  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).  Therefore, section 2254 (e)(1), which mandates that findings of fact made by a state court are presumed correct, overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the non-moving party.  *Id.*  Unless the petitioner can "rebut[] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct.  *Id.*

Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys.  *Haines v. Kerner*, 404 U.S. 519 (1972); *Bledsue v. Johnson*, 188 F.3d 250, 255 (5th Cir. 1999).  Thus, *pro se* pleadings are entitled to a liberal construction that

includes all reasonable inferences that can be drawn from them. *Haines*, 404 U.S. at 521. Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992).

### III. DISCUSSION

### A. Claims Not Cognizable on Federal Habeas Review

Respondent moves for summary judgment on the following claims that he asserts are not cognizable for federal habeas review:

### 1. Actual Innocence

Petitioner contends that he is actually innocent of capital murder and seeks an evidentiary hearing to prove there are controverted and unresolved factual issues. (Docket Entry No.2-1, page 10). According to petitioner such issues include the following: (1) whether complainant's cell phone records, which were not produced by the State, show that the phone was used after her death, presumably by the actual killer; (2) whether the police tape of the initial interview at the police station shows that petitioner was cooperative or uncooperative; (3) whether petitioner was prejudiced and harmed by the State's enactment of the prosecutor's theory of the case and by his trial counsel's failure to rebut such theory; and, (4) whether his trial counsel rendered constitutionally ineffective assistance by his failure to rebut expert witness testimony about the leaf found inside petitioner's home.[2] (*Id*., pages 10-24).

---

[2] Petitioner indicates that he supplemented his state habeas application with evidence that rebutted the testimony of the leaf expert with respect to the use and location of cedar elms. (Docket Entry No.2-2, page 18). He also requested an evidentiary hearing on the rebuttal evidence but was denied by the state courts. (*Id*., page 17).

The state habeas courts found that with respect to petitioner's actual innocence claim that he offered only conclusory allegations and no new evidence, and thus denied such claim.  (Docket Entry No.11-52, page 68).

In federal habeas proceedings, two avenues exist for asserting an actual innocence claim:  a "gateway" claim under *Schlup v. Delo*, 513 U.S. 298, 319–322 (1995), and a "freestanding" claim, as discussed in *Herrera v. Collins*, 506 U.S. 390, 417 (1993).  As a general rule, claims forfeited under state law may support federal habeas relief only if a petitioner demonstrates cause for the default and prejudice from the asserted error.  *See House v. Bell*, 547 U.S. 518, 536 (2006).  However, in *Schlup*, the Supreme Court recognized a "miscarriage of justice" exception to the default principle and held that prisoners asserting actual innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  513 U.S. at 327.  A successful gateway claim under *Schlup* does nothing more than allow an otherwise procedurally-barred claim to be reviewed by the federal court; it does not act to grant habeas relief.  By asserting an actual innocence claim that has been considered and rejected by the state habeas court, petitioner does not raise a *Schlup* gateway claim.

Rather, petitioner raises a "freestanding" claim of actual innocence.  In *Herrera*, the Supreme Court assumed without deciding that, "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  506 U.S. at 417.  In later revisiting the issue of actual innocence, the Supreme Court declined to resolve the question of whether freestanding actual innocence claims are to be recognized in federal habeas proceedings.  *House*, 547 U.S. at 555.  The Fifth Circuit, however,

has reaffirmed its refusal to recognize a freestanding actual innocence claim in federal habeas proceedings. *Cantu v. Thaler*, 632 F.3d 157, 167-68 (5th Cir. 2011), *petition for cert. filed* (U.S. June 9, 2011) (No.10-11031).

Accordingly, petitioner's actual innocence claim must be rejected because a freestanding claim of actual innocence is not a cognizable claim for federal habeas relief.

### 2. Trial Record

Petitioner maintains that he was denied his rights to due process and equal protection because he was not provided with a free copy of his trial records even though he is indigent and mentally challenged. (Docket Entries No.2-1, pages 25-30; No.2-2, pages 1-4). Petitioner claims he should have been provided the record so that he could have assisted his appellate counsel with the appeal. (Docket Entry No.2-1, page 27). Respondent claims that petitioner's claim is not cognizable on federal habeas review because it fails to state a constitutional claim. (Docket Entry No.15, page 16).

The Due Process and Equal Protection Clauses of the Fourteenth Amendment require that states provide indigent defendants with a trial transcript free of charge when it is necessary for meaningful appellate review. *Griffin v. Illinois*, 351 U.S. 12, 19-20 (1956). The State is not required to furnish a complete record so that the defendant may conduct a 'fishing expedition' to seek out possible errors at trial. *Kunkle v. Dretke*, 352 F.3d 980, 985-86 (5th Cir. 1986).

Petitioner fails to state any facts that would give rise to a claim that he was denied a meaningful appellate review because he was denied a free copy of his trial record. Petitioner was represented by appointed appellate counsel, who had access to the record and who filed an appellate brief and a petition for discretionary review in state court. (Docket Entries No.2-1,

page 27; No.18, page 8; No.11-2, No.11-8).  Petitioner does not claim that his appellate counsel rendered ineffective assistance of counsel by failing to raise any claim on appeal.  To the extent that petitioner claims that he could have helped his appellate counsel with the appeal, it is well-established that a criminal defendant has no constitutional right to hybrid representation, "partly by counsel and partly by himself."  *Neal v. Texas*, 870 F.2d 312, 315-16 (5th Cir. 1989); *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation").

To the extent that petitioner complains that the state court violated state rules regarding a free copy of trial records to indigent and mentally challenged criminal defendants, such claim also fails to state a constitutional violation or a challenge to his conviction or sentence and is not cognizable on federal habeas review.  Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented.  28 U.S.C. § 2254;  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Accordingly, petitioner's claims regarding the trial record are not cognizable on federal habeas review.

### 3. Statute of Limitations

Petitioner contends that the one-year limitations period for filing a federal habeas petition under 28 U.S.C. § 2254 is unfair to inmates, like petitioner, who have a mental disability, are not trained in the law, and who were not afforded a copy of their trial transcript. (Docket Entry No.2-2, pages 16-17).

Petitioner's federal habeas petition is not time-barred.  He filed a thirteen page petition and a 137 page memorandum in support of the petition within the one-year limitations

period.  Therefore, he fails to show that the application of the AEDPA deadline is unfair to him or other similarly-situated inmates.

### 4. Factual Sufficiency of the Evidence

Petitioner argues that he is entitled to relief under § 2254 because the jury's guilty verdict was not based on factually or legally sufficient evidence.  (Docket Entry No.2-3, pages 4-8, 13-15).

A federal habeas corpus court reviewing a petition under § 2254 asks only whether a constitutional violation infected the petitioner's state trial.  *See Estelle*, 502 U.S. at 67–68.  The Texas factual-sufficiency standard of review is based on state law.  *See Clewis v. State*, 922 S.W.2d 126, 131–34 (Tex. Crim. App. 1996), *overruled by Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) (holding "that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").  A federal habeas court does not sit as a super state supreme court for review of issues decided by state courts on state law grounds.  *Smith v. McCotter*, 786 F.2d 697, 700 (5th Cir. 1986).  Because a challenge to the factual sufficiency of the evidence does not implicate a constitutional issue, federal habeas review is unavailable for this claim.

### B. Procedural Bar

Next, respondent contends that this Court is procedurally barred from reviewing claims that petitioner raised in his state habeas application that should have been raised on direct appeal, *i.e.,* his complaints regarding peremptory challenges, the destruction and suppression of exculpatory evidence, and his inability to confront the analyst who performed the DNA testing.

(Docket Entry No.15, page 13).  Respondent notes that the state habeas courts declined to review such claims because they were record claims that should have been raised on direct appeal.  (*Id.*).

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991).  In either instance, the petitioner is deemed to have forfeited his federal habeas claim.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  Such procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for procedural default was "firmly established and regularly followed" at the time it was applied to preclude state judicial review of the merits of a federal constitutional claim.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).  Petitioner bears the burden "to demonstrate that the procedural bar is not regularly applied . . . or that the rule was exorbitantly applied under the circumstances of the case."  *Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006) (citations omitted).

Federal review of a claim is procedurally barred if the last state court to consider the claim clearly based its denial of relief on procedural default.  *Ylst v. Nunnemaker*, 501 U.S. 797, 802-04, (1991).  Citing to state case law, the state district court in this case, sitting as a habeas court, found that "[t]he applicant cannot use habeas proceedings to litigate issues that should have been raised on direct appeal, such as his allegation of trial court error."  (Docket Entry No.11-52 page 68).  The Texas Court of Criminal Appeals relied on this finding in denying petitioner state habeas relief.

15

Texas law requires that a petitioner raise on direct appeal any claim based upon the trial court record or forfeit review of such claim. *See Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex Crim. App. 2004). The federal courts recognize Texas's procedural default rule concerning the requirements that record claims must be raised on direct appeal. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005). The Fifth Circuit has also recognized that claims regarding peremptory challenges and the suppression of evidence are record claims that should be raised on direct appeal. *See Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (citing *Ex parte Gardner*, 959 S.W.2d 189, 191 (Texas Crim. App. 1996, *clarified on reh'g* Feb. 4, 1998) (peremptory challenges)); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001) (failure to disclose exculpatory evidence). Likewise, this Court has recognized that a Confrontation Clause claim is a record claim under Texas jurisprudence. *See Andrade v. Thaler*, Civil Action No.4:10-0685, 2011 WL 1044122 at *6 (S.D. Tex. Mar. 16, 2011); *cf. Wright*, 470 F.3d at 587-88 (distinguishing opinion in *Kittleson v. Dretke*, 426 F.3d 306 (5th Cir. 2005) regarding preservation of Confrontation Clause claims). Petitioner, therefore, has not met his burden to demonstrate that this procedural default rule is not regularly applied.

Petitioner's challenge to the legal sufficiency of the evidence to support his conviction is also procedurally barred. Although he complained of the same on direct appeal, he did not challenge the sufficiency of the evidence in his petition for discretionary review. The state habeas court, relying on *Ex parte Christian*, 760 S.W.2d 659, 660 (Tex. Crim. App. 1988), recommended that state habeas relief be denied because "applicant's challenge to the sufficiency of the evidence is not cognizable in post-conviction habeas proceedings." (Docket Entry No.11-52, page 67). "Under Texas law, a prisoner cannot seek habeas review of a sufficiency of the evidence claim that was available but not raised on direct appeal. *Kittelson*, 426 F.3d at 317

16

n.26.   The state habeas court's finding is the last reasoned opinion to rest judgment on the procedural default.

Accordingly, petitioner's legal sufficiency-of-the-evidence claim, his claim regarding the use of peremptory challenges, his prosecutorial misconduct claims regarding the suppression and destruction of evidence, and his Confrontation Clause claim are barred under the doctrine of procedural default unless the petitioner can show that he fits within an exception to that rule.

To overcome the procedural bar, a petitioner must demonstrate "(1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider his claims will result in a fundamental miscarriage of justice."  *Smith v. Johnson*, 216 F.3d 521, 524 (5th Cir. 2000) (quoting *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997)).   Petitioner cites as cause the refusal of the state courts, and his trial and appellate counsel, to provide him with a free copy of the trial record prior to his appellate attorney filing his appellate brief;  petitioner claims such refusal violated his right to access the courts.  (Docket Entry No.18, page 8).  As previously discussed, petitioner has not shown that he was denied a meaningful appeal because the state courts did not provide him with a free copy of the trial record.   Therefore, he fails to show cause for his failure to raise and exhaust these issues on direct appeal.

Moreover, as the state habeas courts found, petitioner has not shown that he is actually innocent of the offense by clear and convincing evidence or by new evidence; therefore, he has not shown that the fundamental-miscarriage-of-justice exception applies in this case.  *See Dretke v. Haley*, 541 U.S. 386, 393 (2004).   Accordingly, petitioner's legal sufficiency of the evidence and the record claims are barred by the doctrine of procedural default.

Alternatively, respondent correctly argues that petitioner's legal insufficiency claim and his record claims do not merit relief.  (Docket Entry No.15).

Petitioner contends that the evidence was insufficient to support his conviction because the inferences the State drew from the circumstantial evidence in this case were not reasonable.[3]  A federal habeas corpus court reviews the evidentiary sufficiency of a state court conviction under the legal standard found in *Jackson v. Virginia*, 443 U.S. 307 (1979).  This standard requires only that a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319.  In conducting that review, a federal habeas corpus court may not substitute its view of the evidence for that of the fact finder, but must consider all of the evidence in the light most favorable to the verdict.  *See Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995).  "Where a state appellate court has

---

[3] Petitioner specifically challenges the following inferences that he alleges the State drew from the circumstantial evidence in this case:

    1.    Petitioner had a motive to kill complainant because she was going to break off their relationship;

    2.    Petitioner acted bizarrely when first confronted by police officers;

    3.    The physical evidence at the scene of the murder showed that petitioner may have had sexual relations with complainant and may have been at the scene;

    4.    At one time petitioner owned a pistol that might have been the murder weapon;

    5.    A leaf found in petitioner's apartment came from a plant that grew in the crime scene area;

    6.    The complainant was at petitioner's apartment the night before the day her body was found; and,

    7.    Other circumstances relied on by the State that indicated that petitioner fled the area.

(Docket Entry No.2-3, page 9).  Petitioner proffers alternative explanations of the evidence presented and complains that much of the evidence is ambiguous.  (*Id.*, pages 8-13).

conducted a thoughtful review of the evidence, moreover, its determination is entitled to great deference." *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993) (citation omitted).

The First Court of Appeals correctly cited to the statutory elements of capital murder in Texas. *Sherrill*, 2008 WL 4670606 at *4 (citations omitted.). Citing state law, the intermediate appellate court further noted that in reviewing the sufficiency of the evidence, the court examines "'events occurring before, during and after the commission of the offense. . . . Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are [sic] sufficient to support the conviction.'" *Id.* at *5. Relying on the *Jackson* standard, the intermediate appellate court summarized the evidence that it found sufficient to support the jury's verdict, as follows:

> The last place Van Osdall appeared alive was Sherrill's apartment. Sherrill admitted to detectives that he had seen her that night. The State presented testimony from numerous sources that Van Osdall intended to end her relationship with Sherrill on the night she died, thus establishing his motive for murdering her. . . . ("Motive is a significant circumstance indicating guilt."). Sherrill contends that Van Osdall ending their relationship is not motive because "it is no more specific to appellant than to any person ending a relationship." The State, however, also presented testimony that Sherrill was possessive of Van Osdall and had threatened to kill himself if she ended the relationship.
>
> The State also presented evidence that Sherrill had purchased one of the four types of guns that fires the type of bullet that killed Van Osdall. The detectives found a leaf in Sherrill's bedroom from the type of tree located near Van Osdall's body-a tree that is not located in or around Sherrill's apartment complex. Van Osdall was not wearing panties when police discovered her body, and the detectives found a pair of Van Osdall's panties in Sherrill's apartment. Furthermore, Sherrill's DNA matched the sperm that detectives found on the dress Van Osdall wore when her body was found in the forest, and his DNA is consistent with the pubic hair found on Van Osdall's sock. Detectives also found Sherrill's fingerprint in Van Osdall's car. Sherrill contends that this evidence could have been left before the murder, and he emphasizes that the model of his gun is common. He asserts that he and Van Osdall had consensual sex when she visited him at his apartment, which explains his DNA on her body. Contrary to that assertion, the State presented testimony that Van Osdall's

arms had been tied with fishing line and that she was very determined to
end her relationship when she went to Sherrill's apartment that night.
Furthermore, Detective Mehl testified that he did not believe the pubic
hair that the investigators found would have remained on Van Osdall's
sock through a walk in the woods, if she had indeed had sexual intercourse
before walking out there.

The State presented additional evidence that Sherrill left Texas soon after
speaking with detectives.  He told his daughter to be careful not to tell
anyone that he was emailing her.  He used an alias when living with a
woman in Montana.  In addition, he called his brother to check whether
police had issued any warrants for his arrest.  The jury reasonably could
have inferred that Sherrill fled the State because he was guilty.

*Id.* at *5-6 (citations omitted.).  The intermediate appellate court noted petitioner's alternative

explanations for the evidence that the State presented, but held that "the jury is ultimately

responsible for weighing the evidence and drawing reasonable inferences from that evidence."

*Id*. at *6.  The intermediate appellate court concluded, as follows, in pertinent part:

Considering the totality of the evidence-motive, the DNA evidence, the
leaf in Sherrill's apartment, Van Osdall's panties in his apartment, and
Sherrill's flight from Texas - we hold that, when viewed neutrally, the
jury's verdict is not against the great weight and preponderance of the
evidence.  We therefore conclude that the evidence is legally and factually
sufficient to support the verdict.

*Id*.

Under *Jackson*, the State need not disprove every hypothesis, so long as it

produces evidence that allows a reasonable jury to infer the elements of a crime beyond a

reasonable doubt.  *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).  *Jackson* instructs that

"a federal habeas court faced with a record of historical facts that supports conflicting inferences

must presume - even if it does not affirmatively appear in the record - that the trier of fact

resolved any such conflicts in favor of the prosecution, and must defer to that resolution".  443

U.S. at 326.  After a thorough review of the entire record, the Court concludes the trial evidence

was sufficient to show each of the essential elements of capital murder.  Viewed in a light most

favorable to the prosecution, the Court finds that from this evidence a rational jury could have found beyond a reasonable doubt that petitioner was guilty of capital murder.  Petitioner presents no clear and convincing evidence to rebut the presumption that the state appellate court's opinion was an unreasonable application of clearly established federal law or an unreasonable application of the facts in light of the evidence presented at trial.

### 2. Confrontation Clause

Petitioner complains that the state district court denied him the right to confront the analyst who actually performed the DNA testing by allowing another analyst to testify to the operative analyst's report.  (Docket Entry No.2-3, page 16).  Petitioner's objection on hearsay and constitutional grounds was overruled.  (Docket Entry No.11-27, pages 51-52).

The Sixth Amendment's Confrontation Clause confers upon the accused "[i]n all criminal prosecutions, . . . the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.   "[F]or testimonial evidence to be admissible, the Sixth Amendment 'demands what the common law required:  unavailability [of the witness] and a prior opportunity for cross-examination.'"  *See Michigan v. Bryant*, __ U.S. __, 131 S.Ct. 1143, 1153 (2011) (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).  The Supreme Court has refused to create a "forensic evidence" exception to this rule.  *Bullcoming v. New Mexico*, __ U.S. __, 131 S.Ct. 2705, 2714 (2011) (citing *Melendez-Diaz v. Massachusetts*, __ U.S. __, 129 S.Ct. 2527, 2538 (2009).

The record shows that the analyst who prepared the DNA report was unavailable because she was on maternity leave.  (Docket Entry No.11-27, page 50).  Forensic Supervisor Cassie Johnson testified that she was the technical leader of the mitochondria and USTR sections of the laboratory that analyzed petitioner's mitochondria DNA.  (*Id*., page 40).  She also testified

that she conducted a technical review of the operative analyst's case work, which was one of her regular job duties.  (*Id.*, pages 41, 50).  Johnson further testified that, as part of this process, she reviewed the laboratory report generated by the analyst, examined the case file and all the data that was generated, and that she agreed with the conclusions and the data that were generated. (*Id.*, pages 52-53).  Johnson testified that, based on the standards in the laboratory where she worked, petitioner and his maternal relatives "could not be excluded as contributors of the mitochondrial DNA from the unknown pubic hair" that was found on complainant.  (*Id.*, page 57).

Arguably, Johnson's technical review and her unquestioned credentials, however, do not qualify her to testify to the operative analyst's report.  *See Bullcoming*, 131 S.Ct. 2705. When the State elected to introduce the operative analyst's DNA report, the operative analyst became a witness that petitioner had a right to confront.  *Id*. at 2716.

The admission of testimony in violation of the Confrontation Clause is subject to harmless error review.  *See Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999).  The test for harmless error in a federal habeas corpus action brought by a state prisoner is "whether the error had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  "The reviewing court must consider 'not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.'"  *United States v. Lage*, 183 F.3d 374, 388 (5th Cir. 1999) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).  Thus, the inquiry is whether the prosecution can "show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *Sullivan*, 508 U.S. at 279 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

22

Testimony regarding the pubic hair in this case was introduced to support the State's theory that complainant had been sexually assaulted in the woods where her body was found.[4]   The mitochondrial DNA of the pubic hair could not be positively identified as petitioner's because "because anyone in his maternal line would have matched it."   *Sherrill v. State*, No.01-07-00503-CR; 2008 WL 4670606, at *3 (Tex. App.--Houston [1st Dist.] 2008, pet. ref'd).   The prosecutor briefly discussed the pubic hair during closing arguments to refute the defense's theory that complainant and petitioner had engaged in consensual sex and to support the State's theory that complainant had been sexually assaulted in the woods.   (Docket Entry No.11-27, pages 127-28).   He also discussed other evidence that led investigators to believe that complainant was sexually assaulted in the woods and to refute the defense's theory of consensual sex.   (*Id.*, pages 128-130).

In light of this other evidence supporting the State's theory regarding the location of the sexual assault and in light of the overwhelming circumstantial evidence of his guilt, the Court finds that the DNA testimony admitted in violation of the Confrontation Clause was harmless, *i.e.,* it did not contribute to the guilty verdict in this case.   Accordingly, the state court's determination of this claim is not an unreasonable application of federal law.

### 3. Peremptory Challenges

Plaintiff seeks the abolishment of the peremptory challenge in state trials because the process of challenging a juror for cause is sufficient to ensure a fair and impartial jury and the

---

[4] Cold case investigator Sgt. Eric Mehl testified that he submitted to the crime lab numerous items collected in the case, one of which was a pubic hair taken off complainant's sock when she was discovered in the woods.  (Docket Entry No.11-25, pages 133-34).  Mehl testified that he found the evidence to be consistent with a sexual assault having occurred in the woods (as opposed to consensual sex at another location), which included the location of semen found inside complainant's dress and her outer thigh.  (*Id.*, pages 162-64, 179-181).  Mehl also opined that the sexual assault occurred where complainant was found in the woods because the pubic hair found on complainant's sock would not have survived the march from the road to the crime scene, given the debris of leaves and underbrush.  (*Id.* at 165).  Mehl testified that he believed that the pubic hair was deposited on complainant's sock during the course of or shortly after the sexual assault.  (*Id.*, page 166).

practice of striking a juror by a peremptory challenge is racist.  (Docket Entry No.2-2, pages 8-15).  With respect to the scope of such challenges, the Supreme Court has stated, the following, in pertinent part:

> We have long recognized that peremptory challenges are not of constitutional dimensions.  They are a means to obtain the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (citations omitted).  Petitioner states no facts that would give rise to a claim that any venire person in this case was excluded by questioning during voir dire, reprimanded by the state district judge, or excluded by a peremptory challenge on account of his or her race or any other improper motive; nor does he state any facts to show that that the jury that sat in this case was impartial.  Accordingly, petitioner's claim is conclusory and subject to dismissal on federal habeas review.  *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings).

### 4. Suppressed and Destroyed Evidence

Petitioner complains that the State destroyed a tape of his police interview that would have refuted testimony that he was uncooperative and shown that he did not injure his hand.[5]  (Docket Entry No.2-2, page 18).  Petitioner also complains that the State refused to turn

---

[5] Petitioner claims that a police officer taped a conversation with him inside an interview room in police headquarters in downtown Houston two days after complainant's death in 2000.  (Docket Entry No.2-2, page 18).  Petitioner claims the tape would show that he was calm, polite, and responded truthfully and with sincerity to every question thus contradicting the officers' portrayal that he was uncooperative, curt, and angry.  (*Id*., pages 18-19).

Petitioner also claims that during the interview, he was asked to show his hands and fingers to the officers, who checked them for any injuries.  (*Id*., page 19).  Petitioner claims that he had no injuries, which would contradict the State's theory of how complainant was murdered.  (*Id*.).

over to his trial counsel the complainant's cell phone records, which might have shown that her cell phone was used after her death by the actual killer.  (Docket Entry No.2-2, pages 26).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused.  *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  Such duty applies to exculpatory and impeachment evidence.  *Id.*

To establish a *Brady* violation, a petitioner must prove the following: (1) the prosecutor suppressed or withheld evidence, (2) which was favorable, and (3) material to the defense.  373 U.S. at 87.

Petitioner has not shown, and the record does not show, that the police officers testified at trial to petitioner's demeanor or to cuts on his hands during the taped interview. Officer Jim Binford testified that during the interview at the police station, petitioner was asked to consent to obtain buccal swabs, hair, and fingernail scrapings; petitioner responded to the request in a manner akin to a temper tantrum when he signed the consent and pushed the paper away.  (Docket Entry No.11-22, pages 59-60).  Binford attested that during this interview, he observed petitioner's fingernails were dirty, which was significant because he knew "at the murder scene that there had been an attempt to cover the woman's body up."  (*Id.*, page 61).  He did not collect that evidence because petitioner announced that he was tired and wanted to go home.  (*Id.*, page 62).  Binford stated nothing else about petitioner's demeanor during the interview at the station.

25

Officer Waymon Allen, Jr. testified when asked to sign the consent during the police interview at the station, petitioner "hung his head and said, no one believes me."  (Docket Entry No.11-23, page 54).  Allen attested that petitioner signed the consent form twice upon his request around 12:25 a.m.  (*Id.*).  Allen also observed that petitioner's fingernails were dirty and wanted to have an officer collect scrapings and fingernail clippings.   (*Id.*, pages 54-55).  Petitioner did not give such samples.  (*Id.*, page 55).  On cross-examination, Allen indicated that petitioner "was cooperative up to a point of when he declined to give us the samples that I asked for."  (Docket Entry No.11-23, page 115).

Moreover, petitioner has not shown that the taped interview with police years before he was arrested and tried for the offense was material to the issue of guilt.  "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."  *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1998).  The aforementioned testimony does not support a finding of materiality given other circumstantial evidence of petitioner's guilt in the record and as noted in *Sherrill v. State*, No.01-07-00504-CR, 2008 WL 4670606 at *4-6 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd).  The Court observes that the state intermediate appellate court discussed such evidence in great detail but did not mention petitioner's demeanor or the condition of his hands during the interview in its analysis of the legal sufficiency of the evidence to support the jury's verdict.  *Id.*

Finally, petitioner has not shown that the State possessed a copy of complainant's cell phone records or that the records would have shown that all calls were made on the phone after her death.  A habeas petitioner is not entitled to relief based on conclusory and speculative allegations of a *Brady* violation.  *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000).

Accordingly, petitioner's *Brady* claims are without merit and the state court's disposition of these claims are not an unreasonable application of federal law.

### C. Jury Charge

Petitioner next contends his rights to due process under the Fourteenth Amendment and his right to a trial by jury under the Sixth Amendment were violated because the state district court did not instruct the jury to unanimously agree whether the offense elevating murder to capital murder was kidnapping or sexual assault; he also contends that he was egregiously harmed by this error.  (Docket Entries No.2-2, pages 27-30; No.2-3, pages 1-4). Petitioner raised this issue on direct appeal and in his petition for discretionary review to the Texas Court of Criminal Appeals.  (Docket Entry No.11-2, pages 1-22).

The First Court of Appeals for the State of Texas, the last court to issue a written opinion on this issue, noted that "the right of juror unanimity 'is more accurately characterized as a due process right than as one under the Sixth Amendment.'"  *Sherrill*, 2008 WL 4670606 at * 6 n.1 (quoting *Manns v. Quarterman*, 236 Fed. App'x 908, 913 (5th Cir. 2007)).  In analyzing this claim, the intermediate appellate court also noted that state law requires unanimous verdicts in all felony cases.  *Id*. at *6.  The state appellate court found that the aggravating factors, *i.e.*, kidnapping and sexual assault, were "alternative means of committing the capital murder that the State alleged in the indictment, and thus, the jury could convict appellant under either theory." *Id*. at *8 citing *Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004).  The state appellate court also affirmatively relied on the holdings of *Kitchens v. State*, 823 S.W.2d 256 (Tex. Crim. App. 1991) and *Schad v. Arizona*, 501 U.S. 624, 642-44 (1991), and distinguished the holdings of *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005) and *Richardson v. United States*, 526

U.S. 813, 119 (1999), which "potentially involve[d] more than one offense," from the present case, which "concern[ed] only one *actus reas* in the murder of Van Osdall." *Id.*

The state intermediate appellate court further found the holdings of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002) inapplicable to the present case "because in those cases, the trial court, instead of the jury, found specific aggravating factors which the Supreme Court determined should have been decided by the jury." *Id.* at *9.  The state intermediate appellate court noted that petitioner's case was tried by a jury and not the trial court, which determined that he committed murder while committing kidnapping or aggravated sexual assault.  *Id.*  The state appellate court concluded that the state district court did not err in submitting a disjunctive jury charge with a general verdict for the single offense of capital murder and thus, petitioner's conviction did "not violate his right to due process, due course of law, or to a jury trial."  *Id.*

In a 2009 unpublished opinion, the Fifth Circuit Court of Appeals found that "'[if] a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law.'"  *Maxwell v. Thaler*, 350 Fed. App'x 854, 859 (5th Cir. 2009) (quoting *Schad*, 501 U.S. at 636)).  Here, as in *Maxwell*, petitioner has not shown that the Texas Court of Criminal Appeals no longer relies on *Kitchens* "for the proposition that the predicate offenses under § 19.03 are alternative methods or means to commit capital murder."  *Id.* citing *Luna v. State*, 268 S.W.3d 594, 601 & n. 16 (Tex. Crim. App. 2008).  With respect to the analysis of the federal due process claim, the Fifth Circuit observed that "neither *Schad* nor our subsequent precedent interpreting it has been overruled implicitly or explicitly.  Accordingly, we are bound

by *Schad* and *Reed* [*v. Quarterman*, 504 F.3d 465, 479 (5th Cir. 2007],[6] which compel our holding that reasonable jurists would not debate that the state court reasonably applied *Schad* and rejected this claim." *Id*. at 860.

In light of the Fifth Circuit's holdings with respect to juror unanimity in Texas, this Court finds that the state appellate court's holdings in this case are not an unreasonable application of federal law.

### D. Ineffective Assistance of Counsel

Petitioner alleges that he received ineffective assistance of counsel at trial. (Docket Entries No.2-3, page 20-30; No.2-4, pages 1-24).  The state habeas courts found that petitioner failed to allege sufficient facts "which, even if true, would entitle him to relief on his instant claims of ineffective assistance of counsel."  (Docket Entry No.11-52, page 67).  The state habeas courts also found that petitioner failed to show that his counsel's representation was deficient or that he was prejudiced by such representation.  (*Id.*).  The state habeas courts further found that petitioner failed to show that his trial counsel's representation was ineffective because he failed to show what a more in depth investigation by trial counsel would have revealed and that his trial counsel's failure to object to admissible evidence did not constitute ineffective assistance of counsel.  (*Id.*, page 68).  The Texas Court of Criminal Appeals denied state habeas relief on such findings.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel.  U.S. CONST. amend. VI.  A federal habeas corpus petitioner's claim that he was denied effective assistance of trial counsel is measured by

---

[6] In *Reed v. Quarterman*, the Fifth Circuit denied petitioner's request for a certificate of appealability on his claim that allowing the jury to convict him of capital murder "under two alternative theories without requiring unanimity as to one" violated due process.  504 F.3d 465, 479-82 (5th Cir. 2007).

the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).   To prevail on an ineffective assistance of counsel claim, petitioner must establish that his counsel's performance was deficient and that the deficiency prejudiced his defense.   *Ogan v. Cockrell*, 297 F.3d 349, 360 (5th Cir. 2002).   The failure to prove either deficient performance or actual prejudice is fatal to an ineffective assistance claim.   *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

Counsel's performance is deficient when the representation falls below an objective standard of reasonableness.   *Ogan*, 297 F.3d at 360.   Judicial scrutiny of counsel's performance must be "highly deferential," indulging in a "strong presumption" that "trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy."   *West v. Johnson,* 92 F.3d 1385, 1400 (5th Cir. 1996).   To overcome this presumption, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."   *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1993).   Mere "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 687-90.   A deficiency in counsel's performance, standing alone, does not equal ineffective assistance of counsel if no actual prejudice is demonstrated.

Counsel's deficient performance results in actual prejudice when a reasonable probability exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*   Confidence in the outcome of the trial is undermined when counsel's deficient performance renders "the result of the trial unreliable or the proceeding fundamentally unfair."   *Pratt v. Cain*, 142 F.3d 226, 232 (5th Cir. 1998) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).   "Unreliability or unfairness does not result if

the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Pratt*, 142 F.3d at 232 (quoting *Lockhart*, 506 U.S. at 372).

A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001). Because petitioner's ineffective-assistance claims were previously considered and rejected on state habeas corpus review, the state court's decisions on those claims will be overturned only if it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Petitioner's trial counsel laid out his theory of the case and his trial strategy in his closing argument. (Docket Entry No.11-27, pages 105-06). Counsel did not dispute the facts of the case or the credibility of the witnesses. He agreed that the evidence showed that complainant had been murdered by the reservoir and that complainant and petitioner had a short, but intense personal relationship, which complainant decided to end. (*Id*, pages 106-07). Counsel argued that other facts were less than certain because the witnesses who testified at trial were looking backward through the prism of hindsight with knowledge that petitioner had been charged with her murder. (*Id.*, pages 107-09). Counsel reminded the jurors that there was no evidence that petitioner had threatened to harm complainant or that he acted violently toward her; instead, the evidence showed that she was concerned about him. (*Id.*). He agreed that the State had presented a viable theory that complainant was forced by her assailant from the road to the reservoir because her hands were bound, but he raised the possibility that her hands might have been bound once there; he argued that the State presented no evidence that complainant was sexually assaulted at the reservoir. Counsel then addressed the circumstantial evidence admitted in the case, offered an alternative inference that might be drawn from the evidence to rebut the

State's case, and questioned whether jurors could find from such circumstantial evidence proof beyond a reasonable doubt that petitioner had murdered complainant.  (*Id.*, pages 109-122).

Petitioner claims that should have done more to rebut the State's case, as follows:

### 1. Investigation

Counsel has a duty to conduct a reasonable pretrial investigation into the facts and pertinent law of a criminal case or to make a reasonable decision that makes particular investigations unnecessary.  *See Strickland*, 466 U.S. at 691.  A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.  *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

Petitioner complains that his trial counsel failed to investigate petitioner's work records, email and text-messaging records, and personal records that showed that he used his real name when he resided outside the State of Texas, to rebut the prosecution's theory that he fled the State because he was guilty of the offense.  (Docket Entries No.2-1, page 9; No.2-3, pages 22-23, 25).   Petitioner claims that although counsel had knowledge of petitioner's former employer a year before trial, counsel waited under the day of trial to telephone the employer in Las Vegas.  (Docket Entry No.2-3, page 26).  The manager verified petitioner's employment and indicated that petitioner's work records could be found in the home office in South Carolina. (*Id.*).

The record reflects that petitioner's trial counsel was aware that petitioner used his real name while living in Las Vegas and that he argued for the exclusion of testimony that petitioner used a false name and lied to a girlfriend that he met over the internet weeks after

complainant's death.[7]  (Docket Entry No.11-23, pages 6-9).  Trial counsel indicated to the state district court that petitioner would testify that he worked in Las Vegas under his own name. (Docket Entry No.11-24, page 83).  Based on such expectation, counsel could have reasoned that further investigation was unnecessary or that he would be able to acquire the information from the home office before petitioner testified.  Petitioner, however, chose not to testify and therefore, no evidence was introduced to rebut the State's theory that petitioner fled the state and avoided detection by using an alias.  (Docket Entry No.11-27, page 93).  Moreover, petitioner states no facts to show how he was prejudiced by his counsel's failure to investigate his personal records given other evidence that was admitted at trial regarding his use of the internet to avoid detection by law enforcement.[8]  (Docket Entries No.11-25, pages 29-31; 33-35; 41-42).

Petitioner also complains that his trial counsel failed to investigate whether cedar elm trees grew at the gun range, which is located near the murder scene and where he and complainant shot guns the week before the murder; petitioner contends such evidence would rebut the prosecution's theory that the leaves found in his apartment came from the murder site. (Docket Entries No-2-1, page 17; No.2-3, pages 23-25).  Petitioner also claims that the leaves were planted in his home by detectives who questioned him.  (Docket Entry No.2-1, page 17). He further complains that trial counsel failed to obtain the gun range records, which would have

---

[7] The prosecutor indicated that the State had no information about whether petitioner was using an alias while he was in Las Vegas after complainant's murder in 2000, because the State was unable to acquire the motel records where he stayed at that time.  (Docket Entry No.11-24, page 81).  She indicated that the State had no information on petitioner's location until 2003, when he was admitted to a psychiatric hospital using his real name.  (*Id.*, page 82). Petitioner's trial counsel argued that that there was no evidence that petitioner used a fake name and that petitioner worked in Las Vegas under his own name.  (*Id.*, page 83).

[8] Petitioner's ex-wife and daughter testified about the emails petitioner sent to his daughter for four years after he left the State, in which petitioner urged his daughter to be discreet and secretive in their correspondence and communication for fear the police might track him.  (Docket Entry No.11-24, pages 23-49).

corroborated his statement to detectives that he gave complainant his gun after their visit to the gun range.  (Docket Entries No.2-1, page 9, No.2-3, page 23-24).

Petitioner does not point to any evidence in the record that cedar elm trees grew at the gun range or that the gun range records would show that he gave his gun to complainant the week before her death.  Petitioner fails to note that his trial counsel elicited testimony from Sgt. Mehl, who accompanied the tree expert that discovered the cedar elm tree close to the murder site, that the tree from which they recovered a leaf was small, *i.e.,* around fifteen inches in size. (Docket Entry No.11-25, page 187).  Upon further questioning, Mehl conceded that he was not trying to imply that the leaf discovered in petitioner's apartment was from that tree.  (*Id*.). Although petitioner claims the plant evidence was significant, his trial counsel argued in closing that the plant evidence was not significant because the State could not prove where the leaf came from but only that "the leaf exists on trees near the Addicks Reservoir and in many other places." (Docket Entry No.11-27, page 120).

Trial counsel also argued that the State did not present any evidence of guns or gun equipment in the apartment.  (*Id.*, page 114).  Had trial counsel sought to rebut evidence regarding the cedar elm tree leaves with evidence that cedar elm trees grow at the gun range or to show that petitioner had been at the gun range with complainant the week before the murder, he would have, in effect, tied petitioner to a gun.

Without more, petitioner fails to overcome the presumption of correctness to which the State court's findings are entitled with clear and convincing evidence.  He has also failed to demonstrate that the state courts' determination of his claims was contrary to or an unreasonable application of clearly established Supreme Court precedent, or resulted in actual prejudice.

34

### 2. Suppressed or Destroyed Evidence

Petitioner complains that his trial counsel failed to object that the prosecution had destroyed the initial police interview tape and failed to vigorously cross-examine the detectives about the destruction of this tape. (Docket Entries No.2-1, page 15; No.2-4, pages 1-3). Petitioner claims that the tape would show his calm demeanor and cooperative attitude. He also claims the tape would show that he suffered no injury to either hand, which petitioner contends would rebut the State's theory of the case. (Docket Entries No.2-1, pages 15-16; No.2-4, pages 1-3). Petitioner further complains that his trial counsel failed to obtain complainant's cell phone records. (Docket Entries No.2-1, page 9; No.2-4, pages 3-4).

As previously discussed, petitioner's claims regarding such evidence do not give rise to a due process claim; therefore, he cannot show that the state courts' findings with respect to counsel's failure to investigate such claims were unreasonable under the AEDPA standard.

### 3. Uncalled Witnesses

Petitioner contends that his trial counsel failed to employ a ballistic's expert to challenge the type of gun from which the bullet that killed complainant had been fired and to employ a forensic botanist to challenge evidence of the cedar elm leaf. (Docket Entries No.2-1, pages 17, No.2-4, pages 4-5, 5-6). Petitioner also complains that his trial counsel did not question or call as witnesses his family members and live-in girl friend to testify that he has not fished since 1984. (Docket Entries No.2-3, pages 28-30; No.2-4, page 1).

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 238 (5th Cir. 2009). To prevail on claim based on counsel's failure to call a lay or

expert witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set forth the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id.*

Petitioner states no facts to show the necessity of employing a ballistic expert. The State's expert testified that the bullet used in the murder could have come from one of four guns, including a common and popular model that petitioner owned.[9]  (Docket Entry No.11-24, pages 63, 72, 75).  Moreover, petitioner states no other facts showing that he was prejudiced by his counsel's failure to call such expert.

Although petitioner attached supplements from tree experts to his state habeas application, he states no facts to show that these witnesses, or any other forensic botanist, were available to testify at trial or that they would have done so.  Likewise, petitioner did not support his "no-fishing" claim with affidavits from his family and friends about his fishing habits or lack thereof.[10]  Accordingly, he fails to show that his trial counsel rendered ineffective assistance by failing to employ a tree expert or to question family and friends regarding his fishing habits or that the state habeas court's findings were unreasonable under the AEDPA standard.

---

[9] Trial counsel argued in closing statements that no one found any evidence of guns or gun gear in petitioner's apartment.  (Docket Entry No.11-27, page 114).

[10] The record shows that petitioner had checked on a dating service application that he engaged in fishing and football on a regular basis.  (Docket Entry No.11-21, page 95).  Although complainant had been bound with fishing line, the investigating officer who searched petitioner's apartment shortly after her murder found no fishing equipment in the apartment.  (Docket Entry No.11-23, page 115).  Furthermore, petitioner's brother, ex-wife, and daughter testified for the State but were not questioned by the prosecutor or defense counsel regarding petitioner's fishing habits.  (Docket Entries No.11-25, pages 8-45; No.11-24, pages 23-50).  Petitioner's trial counsel argued in closing arguments that although the dating service form showed that he had checked fishing as one of his activities, there was no evidence that there was fishing equipment in his apartment or that he ever fished once in his life. (Docket Entry No.11-27, pages 113-14).

<u>4. Cross-Examination of Adverse Witnesses</u>

Petitioner maintains that his trial counsel failed to effectively cross-examine adverse witness Debbie Strandberg, who testified that petitioner used a false name while corresponding with her over the internet and engaged in a relationship with her with the false name shortly after the murder. (Docket Entry No.11-27, pages 65-77). Petitioner's trial counsel voiced numerous objections to her testimony, both before and during her testimony. (Docket Entries No.11-23, pages 6-13; No.11-24, pages; No.11-24, pages 80-94; No.11-27, pages 64, 68, 69, 73, 74, 76-80, 83, 84, 85). Trial counsel, however, did not question her on cross-examination. (Docket Entry No.11-27, page 86).

Petitioner presents no evidence that a cross-examination of Strandberg would have rendered valuable information regarding his motive for giving her a false name or that trial counsel's strategic decision to forgo cross-examination fell below an objective standard of reasonable assistance. Accordingly, he fails to demonstrate that his trial counsel rendered ineffective assistance by failing to cross-examine Strandberg or that the state courts' findings were unreasonable under the AEDPA.

Petitioner claims that his trial counsel poorly cross-examined the State's expert tree witness because counsel had not adequately investigated the cedar elm tree evidence or employed a forensic botanist for the defense. (Docket Entries No.2-1, pages 9, 20-21; No.2-4, page 6). Petitioner also complains that his trial counsel did not adequately cross-examine the detectives who testified about discovering the leaf in petitioner's apartment as to whether the leaf was properly handled and stored by the State. (Docket Entries No. 2-1, page 21; No.2-4, pages 7-11). As previously noted, petitioner's trial counsel found the plant evidence to be insignificant

because the State could not prove where the leaf actually came from.  (Docket Entry No.11-27, page 120).

Petitioner is challenging his trial counsel's overall strategy with respect to the plant evidence, to which this Court must give deference, and has not presented any reason why the state court's decision on this claim was unreasonable.  *See Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007) (challenge to strategy does not establish ineffective assistance). Petitioner's ineffective assistance claim on the cross-examination of these witnesses is without merit.  Furthermore, he has not shown that the state habeas court's findings regarding his counsel's representation were unreasonable under the AEDPA standard.

### 5. Venire Persons

Petitioner contends that his trial counsel failed to object to the trial judge intimidating a venire person in voir dire and excusing him for cause; he complains that counsel also failed to request a hearing to ascertain whether a venire member, who knew complainant, had tainted the jury panel.  (Docket Entries No.2-1, page 9; No.2-4, pages 13-16).  Petitioner, however, does not cite the trial record to support a claim of intimidation or misconduct.  The Court has thoroughly reviewed the entire record and found no evidence of juror intimidation. With respect to the venire person who was acquainted with complainant's family and familiar with her, the record shows that such venire person informed the state district judge early in the voir dire, before questioning by either attorney.  (Docket Entry No.11-19, page 35).  The record reflects no evidence that such venire person engaged in misconduct or that a hearing was necessary to determine if the venire panel had been tainted.

"Counsel cannot be deficient for failing to press a frivolous point.  *Sones v. Hargett*, 61 F.3d 410, 415, n. 5 (5th Cir. 1995).

### 6. Jury Instruction

Petitioner complains that his trial counsel failed to request a lesser-included jury instruction of first or second degree murder or to object to the state district court's failure to include the same in the jury charge.[11]   (Docket Entries No.2-1, page 9; No.2-4, pages 12-13). Petitioner, however, states no facts to show that he was entitled to such instruction or whether the state district court would have granted such motion.[12]   A failure by counsel to file a motion does not *per se* constitute ineffective assistance of counsel.  *See Kimmelman v. Morrison*, 477 U.S. 365, 383-84 (1986).   A determination of ineffectiveness "depends on whether either a suppression motion or an objection would have been granted or sustained had it been made." *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987).  Petitioner, therefore, fails to show that the state habeas court's findings were an unreasonable application of the standards provided by clearly established federal law for succeeding on an ineffective assistance claim.

### 7. Challenging Demonstrative Evidence

Petitioner claims counsel failed to use the State's own demonstrative evidence to prove that he was innocent by replaying the trial tape, thoroughly cross-examining the officer who participated in the demonstration, and informing the jury that petitioner suffered no injury to his hands.  (Docket Entries No.1, page 12; No.2-1, pages 16-17; No.2-4, pages 16-18).

---

[11] Petitioner's trial counsel indicated that he had no objection to the charge.  (Docket Entry No.11-27, page 98).  The charge did not include a lesser-included offense instruction.  (Docket Entry No.11-17, pages 36-43).

[12] "A defendant is entitled to [a lesser included offense] instruction if the jury could rationally acquit the defendant on the capital crime and convict on the non-capital crime."  *Aguilar v. Dretke*, 428 F.3d 526, 531 (5th Cir. 2006)). Under Texas law, for a lesser included offense instruction to be given, 'there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense."  *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir 2009).  "'Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge.'" *Threadgill v. Thaler*, 425 Fed. App'x 298, 304-05 (5th Cir. 2011) (quoting *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001)).

The record shows that Sgt. Mehl and the prosecutor demonstrated for the jury the prosecution's theory of how complainant was shot based on the evidence gathered at the scene and photographs taken at the time of discovery.  (Docket Entry No.11-25, pages 176-182).  On cross-examination, trial counsel elicited testimony from Sgt. Mehl that he never saw the body at the scene and that it was possible that the body had been moved.  (*Id.*, pages 183-84).  He also elicited testimony that a substance on complainant's thigh, which was thought to be semen, did not exist after the autopsy was performed.  (*Id.*, page 183).  He also pointed out the inconsistency of Mehl's account of the murder with Sgt. Binford's account.  (*Id.*, page 186).

The State presented no evidence that would show that the murderer would have suffered any injury to his hands under any theory of the case; therefore, petitioner fails to show the necessity of presenting evidence that he did not suffer an injury to his hands.

Moreover, prejudice cannot be established with mere speculation or conjecture. *See Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).  Accordingly, petitioner fails to show that the state court's findings regarding trial counsel's reasonably effective assistance were unreasonable under the AEDPA standard.

### 8. Objection to Prosecutor's Closing Argument

Petitioner claims that his trial attorney's performance was deficient because he failed to object to the prosecutor's statement in closing argument that the jury was not required to return a unanimous vote in deciding the aggravating element of the offense.  (Docket Entries No.1, page 12, No.2-1, page 9; No.2-4, pages 18-20).  Petitioner fails to show that the prosecutor's arguments were error or that any objection to her statements would have been sustained in light of the Fifth Circuit's holding with respect to juror unanimity in Texas.  The failure of petitioner's trial counsel to make a meritless objection does not constitute deficient

performance.  *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that "counsel is not required to make futile motions or objections").  Accordingly, he fails to meet his burden under the AEDPA with respect to these claims.

<u>III. CERTIFICATE OF APPEALABILITY</u>

A certificate of appealability from a habeas corpus proceeding will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations and citations omitted).  Stated differently, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*; *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001).  On the other hand, when denial of relief is based on procedural grounds, the petitioner must not only show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling."  *Beazley*, 242 F.3d at 263 (quoting *Slack*, 529 U.S. at 484); *see also Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).  A district court may deny a certificate of appealability, sua sponte, without requiring further briefing or argument.  *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court has determined that petitioner has not made a substantial showing of the denial of a constitutional right.  Therefore, a certificate of appealability from this decision will not issue.

IV. CONCLUSION

Finding no unreasonable application of clearly established federal law in the record of the state proceedings, the Court ORDERS the following:

1.      Respondent's Motion to Substitute Counsel (Docket Entry No.24) is GRANTED.  Assistant Attorney General Ellen Stewart-Klein is withdrawn and Assistant Attorney General Joseph P. Corcoran is substituted as Attorney-in-Charge for respondent.

2.      Petitioner's motions to supplement the record (Docket Entries No.19, No.21, No.22) and to compel the state district court to produce the trial video (Docket Entry No.23) are DENIED.  *See Cullen v. Pinholster*, --U.S.--, 131 S.Ct. 1388, 1398 (2011).

3.      Respondent's motion for summary judgment (Docket Entry No.15) is GRANTED.

4.      Petitioner's petition for federal habeas relief is DENIED.

5.      A certificate of appealability is DENIED.

6.      All other pending motions are DENIED.

7.      This habeas action is DISMISSED with prejudice.

The Clerk will provide a copy to the parties.

SIGNED at Houston, Texas, this 5th day of March, 2012.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

42